602 So.2d 144 (1992)
In the Interest of BABY BOY SMITH.
No. 92-CA-505.
Court of Appeal of Louisiana, Fifth Circuit.
June 23, 1992.
Writ Denied July 10, 1992.
Michael A. Giambelluca, New Orleans, for appellants.
Wiley J. Beevers, Gretna, for appellees.
*145 Before KLIEBERT, GAUDIN and GRISBAUM, JJ.
GRISBAUM, Judge.
This appeal concerns the surrender of parental rights, i.e., the trial court's denial of the natural mother's Motion to Annul her Formal Act of Surrender. We affirm.

ISSUES
We are called upon to determine the following critical questions:
(1) Whether the trial court was manifestly erroneous in its determination that the Act of Surrender was not null and void as a result of fraud, duress or other vices of consent and the natural mother did make a free, voluntary, and informed decision to surrender her child, and
(2) Whether the trial court's finding that the best interest of the child is served by his remaining with the prospective adoptive parents is manifestly erroneous.

FACTS
On October 4, 1991, Ronda Marie Smith, an unwed 18-year-old woman, gave birth to a baby boy. Three or four days after his birth, the boy was placed in the care and custody of an anonymous married couple, who intended to adopt the child. Thereafter, on October 10, 1991, Ms. Smith and the child's biological father, Shane James Smith, each signed a Formal Act of Surrender, which thereby freed the child for adoption.
On October 16, 1991, Ms. Smith served the attorney representing the prospective adoptive parents with a Declaration of Intention to Revoke the Act of Surrender. She then filed, in March of 1992, a Motion to Annul Formal Act of Surrender, to Revoke Consent to the Surrender and Adoption of Baby Boy Smith, for Custody and for an Expedited Best Interests Hearing. Mr. Smith, to whom Ms. Smith was now married, joined in this action. As grounds for declaring the Act of Surrender null, the motion alleges that "the attorney selected by counsel for the prospective adoptive parents was not completely independent and he did not provide adequate and effective counsel to mover in order to enable her to make a voluntary and informed choice about whether to surrender her child." Furthermore, the motion alleges that it is in the child's best interest that he be returned to his natural parents.
A hearing was held on April 6-7, 1992. Mr. Smith was dismissed from the action for failing to comply with the statute which requires that notice of an intent to revoke an Act of Surrender be given within 30 days after the execution of the Act of Surrender (La.R.S. 9:422.10). The trial court denied the motion, determining that Ms. Smith made a free, voluntary and informed decision to surrender the child for adoption. It further found that the best interest of the child would be served by his remaining with the prospective adoptive parents. This appeal, thus, ensued.

ANALYSISISSUE ONE
At the outset, our standard of review in this instance is purely and simply "manifest error." Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Accordingly, the trial judge's factual findings are entitled to great weight and are not to be disturbed absent a showing of manifest error. Additionally, we are compelled to recognize that the trial judge is in a better position to evaluate live witnesses as opposed to our access to only a cold record. Canter v. Koehring Co., 283 So.2d 716 (La.1973). With this standard as our guide, we now turn to the issues presented.
Our jurisprudence is replete in finding that a natural parent's consent to surrender a child may be vitiated by error, fraud, or duress. In re J.M.P., 528 So.2d 1002 (La.1988). If the natural parent asserts that the Act of Surrender is null, the natural parent has the burden of proving the facts giving rise to the nullity. In the matter of Adoption of Smith, 578 So.2d 988 (La.App. 4th Cir.1991), writ denied, 581 So.2d 687 (La.1991); In re J.M.P., supra, at 1009.
Counsel for the natural parents indicated at the hearing that it was their contention that the Surrender was obtained through fraud, duress or other improper practices.
*146 La.C.C. art. 1953 provides that fraud is a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. It must be proven by a preponderance of the evidence. La.C.C. art. 1957. Likewise, consent may also be vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation. La. C.C. art. 1959.
Recognizing our jurisprudential and statutory guidelines, we find that the record projected no evidence that Ms. Smith was subjected to any duress. The record shows her decision to sign the Act of Surrender was admittedly induced by her feeling that adoption was in the best interest of the child. Simply put, there was no showing of any outside pressures which contributed to her decision.
With respect to fraud, Ms. Smith testified that she was told she could unconditionally revoke the Act of Surrender within 30 days and regain custody. She further stated she was not told that her revocation did not guarantee the return of her child. However, Mr. Wayne Walker, the notary public present at the signing of the Act of Surrender, testified that he read the documents to Ms. Smith and informed her that she had 30 days within which to revoke her consent, but this did not automatically revoke it; rather, at that point, a judge would determine what was in the best interest of the child. The fact that this statement was verbally given to Ms. Smith was confirmed by two other witnesses who were present at the signing of the Act of Surrender.
At this point we must remind ourselves that a trial judge's findings, which turn on the credibility of the witnesses, are entitled to great weight and are to be reversed only when the record shows that these findings are clearly wrong. Guy T. Williams Realty, Inc. v. Shamrock Constr. Co., 564 So.2d 689 (La.App. 5th Cir.1990), writ denied, 569 So.2d 982 (La. 1990). From this record, we cannot say that the trial judge was "clearly wrong" in his assessment of the witnesses' testimony with respect to what Ms. Smith was told. Thus, we must conclude there was a substantial basis for the trial court's conclusion that the Act of Surrender was made without fraud, duress, or any other vices of consent.
We now turn to the question of whether surrender was made pursuant to a voluntary and informed decision. The critical question is whether Ms. Smith was provided with adequate and effective assistance of counsel. La.R.S. 9:422.3(A), in pertinent part, provides as follows:
The parent or parents of a child may execute an authentic act for the purpose of voluntarily surrendering the custody of the child for private adoption. If the birth mother is dead and the child's father has not acknowledged paternity of the child as provided in this Subpart or the child's father is unknown, the child's tutor may execute the act of surrender for private adoption. The act of surrender shall be presumptive evidence of a legal and voluntary surrender only if it contains every element required by R.S. 9:422.6, and is in all other respects executed in accordance with the provisions of this Subpart.
Additionally, La.R.S. 9:422.7(A), in pertinent part, provides:
The surrendering parent or parents, and his, her, or their legal representative, if applicable, or the child's tutor, as provided in R.S. 9:422.3(A), shall be represented at the execution of the act by an attorney at law licensed to practice law in Louisiana; provided, however, the attorney representing such person or persons shall not be the attorney who represents the person or persons who are the prospective adoptive parents, or an attorney who is a partner or employee of the attorney or law firm representing the prospective adoptive parents.
(Emphasis added.)
The testimony adduced at the hearing demonstrates the following scenario: Ms. Smith, the natural mother, did not hire an attorney; rather, she met with Mr. Wiley Beevers, the prospective adoptive parents' *147 attorney, on several occasions prior to the signing of the Act of Surrender. On the actual day of the signing, an attorney, one Mr. Gary Raphael, was present on her behalf. However, he was paid by Mr. Beevers. More importantly, the testimony is likewise clear that Mr. Beevers and Mr. Raphael work for different law firms and that Mr. Beevers has no business relationship whatsoever with the law firm that employs Mr. Raphael.
We recognize there is jurisprudence which suggests that the representation of the surrendering parent should, at the very least, be free from conflict. Wuertz v. Craig, 458 So.2d 1311 (La.1984). More recently, however, the Louisiana Supreme Court has stated that "the surrendering parent, in order to annul the act o[f] surrender, must at least show that her attorney's conflict of interest induced an error concerning a circumstance that substantially influenced her to consent to the surrender." In re J.M.P., supra, at 1010. We find no such conflict of interest.
Finally, with this standard in mind, we now address whether the representation provided by Mr. Raphael was so inadequate and ineffective as to render the decision to surrender her child uninformed and involuntary. In doing so, we do take note of the fact that the record shows Mr. Raphael did not, himself, read the Act of Surrender to Ms. Smith. However, the Act of Surrender was read twice to Ms. Smith; first, by Mr. Beevers, followed by Mr. Walker. During this reading, Ms. Smith was provided with a copy to follow. She had indicated previously that she was able to read. Moreover, she admitted to being told to stop and ask questions if she did not understand something, which she did not do at any time during this proceeding.
The record further indicates that Mr. Walker and Mr. Beevers asked Ms. Smith whether she understood what she was doing and she indicated that she did. Mr. Walker explained the legal meaning and the effect of the documents to Ms. Smith. Furthermore, when reading the Act of Surrender to her, Mr. Beevers stopped at the end of each and every paragraph and explained it.
After these readings, Ms. Smith and Mr. Smith were left alone with Mr. Raphael. He asked whether they had any questions and whether they would like him to go over the document again. They did not, and he, then, explained the legal effect of the Act of Surrender to them. Neither wanted to confer with another attorney when Mr. Raphael offered this suggestion. He, therefore, was fully convinced they knew what they were doing.
We note the trial court, in its judgment, stated that
The Court, found as a fact that both Ronda Smith and Shane Smith were properly advised of the legal meaning and effect of the Acts of Surrender, were represented by independent counsel who provided them adequate and effective counsel and that the independent notary as well advised Ronda and Shane Smith as to the legal meaning and effect of the [S]urrender and that they made a free, voluntary and informed decision and did in fact surrender the child for adoption. Based on the finding of fact above[-]mentioned, the Formal Act of Surrender will not be annulled.
(Emphasis added.) We agree.
After a careful examination of all the record testimony for the single purpose of ascertaining if there were factors which may have prevented Ms. Smith from making a knowing and voluntary surrender, we find none. Although she met with Mr. Raphael only briefly before the Act of Surrender being read and explained to her, we find that the other contemporaneous factors surrounding the entire event made the decision to surrender her child an informed one.

ANALYSISISSUE TWO
Since it is undisputed that Ms. Smith did timely declare her intention to revoke consent to surrender, we must now view whether the adoption is in the best interest of the child in accordance with our statutory scheme and our jurisprudential guidelines. See La.R.S. 9:422.11(A) and In re J.M.P., supra. Additionally, the Louisiana *148 Supreme Court has declared that the burden of proof with respect to best interest of the child is on the adoptive parents, not the natural parents. In re J.M.P., supra. Our jurisprudence has further provided that best interest of the child in an adoption must be decided on the particular facts of each case, and the trial judge is vested with great discretion. Knapp v. Adoption of Cotten, 577 So.2d 241 (La. App. 1st Cir.1991), writ denied, In re Knapp, 580 So.2d 364 (La.1991). "This discretion is not absolute, and the trial judge's determination of best interest is subject to reversal if the record reveals manifest error in his determination." Id. at 247 (citation omitted).
The trial judge, in his judgment, stated that
The Court finding by clear and convincing evidence that it is in the child's best interest to remain with the prospective adoptive parents, because the prospective adoptive parents are fit to serve as the child's parents, from the child's prospective [sic] the adoptive parents have become the psychological parents and it is in the best interest of the child that the adoption go forward.
(Emphasis added.) We agree and the record fully supports his finding.
We see Dr. Michael Jepsen, a licensed psychologist, explained that during the first six to eight months of life, a bonding process takes place, which "lays the ground work for all future interpersonal relationships...." He further testified that children whose bonding process is disrupted will eventually develop interpersonal relationship problems.
After observing the prospective adoptive parents with the child, Dr. Jepsen concluded that bonding is in progress and that the child has fully bonded with the prospective adoptive mother. He further opined that it would be in the child's best interest to remain with his prospective adoptive parents.
Dr. A. James Klein, a clinical psychologist and expert in child psychology, elaborated in greater detail on this bonding process. He stated that children who are separated from their parents early in life later have incredible problems in their emotional and social development "sometimes affecting every aspect of their functioning." He testified that to remove the child from the prospective adoptive parents would be catastrophic. He stated, "I can't under estimate to this Court the impact of a separation experience on a young child."
Dr. Klein met with the prospective adoptive parents and the child. He initially noted that the parents were "psychologically normal functioning people" and that "[t]here was nothing to contraindicate their ability to parent...." After observing the interaction of the family, Dr. Klein found that the child is "very well along into his development" and that he has developed attachments to the family. He also noted that the prospective adoptive parents have a three-year-old daughter, who was also adopted. He stated that the psychological consequences to the girl would be catastrophic as well were the child to be taken away. She would begin to experience the anxiety that she, too, could be taken away. As Dr. Klein explained, "It would be like a death to this little girl."
After viewing the testimony of the "best interest" phase of this proceeding, we think it appropriate to quote part of the leading case of In re J.M.P., supra by the Louisiana Supreme Court, Justice Dennis as its organ, which stated,
When the natural parent poses no danger to the child's physical health, and the child has not yet formed an attachment to and begun to view one of the adoptive parents as his psychological parent, the natural parent should be preferred over others.... [However,] if the adoptive parents are fit, and the child has formed a psychological attachment to one or both of them, the adoptive parent should be preferred so as to avoid the grave risk of mental and emotional harm to the child which would result from a change of custody.
Id., at 1014-1016 (emphasis added.)
With this standard as our guideline, we cannot help but be convinced that the evidence as a whole supports the trial court's *149 determination that the adoption is in the child's best interest. The baby boy has been with the prospective adoptive parents since he was few days old, which, at this point, is approximately eight months. Most importantly, he has developed a significant psychological attachment to his prospective adoptive parents. We, therefore, cannot say that the trial court was manifestly erroneous in its determination that the child's best interest is served by his remaining with the prospective adoptive parents.
Other issues have been raised which, we find, have no merit.
For the reasons assigned, the trial court's judgment dated April 8, 1992 is hereby affirmed. All costs of this appeal are to be assessed against the appellants.
AFFIRMED.
KLIEBERT, J., dissents.
KLIEBERT, Judge, dissenting.
I respectfully dissent from the majority's decision to affirm the trial court's ruling. In my view the trial judge committed manifest error in refusing to grant the natural parent's request (during trial and by motion for a new trial after judgment) for time in which to introduce evidence, including expert witness testimony on the issue of psychological bonding of the child with the natural parents and/or the prospective adoptive parents.
Under the mandate of In Re J.M.P., 528 So.2d 1002 (La.1988), in deciding the best interest of the child the trial court and this Court should follow the guidelines set forth by the Supreme Court at page 1015:
"If the natural mother is fit, the broad social policy of basing custody and responsibility on the biological relationship outweighs whatever material advantages might be provided by the adoptive parents, if neither of the adoptive parents is the child's psychological parent. On the other hand, if the adoptive parents are fit, and the child has formed a psychological attachment to one or both of them, the adoptive parents should be preferred so as to avoid the grave risk of mental and emotional harm to the child which would result from a change in custody, even if the natural parent is relatively affluent."
Here, since both sets of parents (natural and prospective adoptive) are fit, the award of custody turns on whether there was psychological bonding of the child with either set of parents.
At the time of the "best interest hearing" held in this case on April 6, 1992, the child was only six months of age. In the In Re J.M.P. case, at page 1016, the Supreme Court said:
"The child who was five months old at the time of the best interest hearing, is now [at the time of appeal hearing] approximately 2 ½ years old. We can only speculate as to the child's psychological development at the time of the hearing and as to what has occurred since. It is quite possible that the child by now has acquired a strong and healthy psychological attachment to her adoptive parents. There is also the possibility that the child tragically has no psychological parent.
More happily, it is possible that the child has developed a psychological tie with her natural mother if there has been regular contact between the two. We cannot decide what is in the best interest of this child on the basis of these speculations.
Accordingly, in the interest of justice we will vacate the adoption decree and remand the case for a new hearing on the best interest of the child."
Thus, notwithstanding the inordinate time taken by the legal process, "in the interest of justice" the Supreme Court in In Re J.M.P. remanded the case with the instructions stated at page 1016:
"The trial court is directed to take steps, including the appointment of an expert by the court if necessary, to develop evidence as to the child's possible psychological attachment to the natural or adoptive parents."
Here, although the formal petition opposing the adoption was not filed until March 20, 1992, the court was given "informal evidence" of the desire of the natural mother *150 to oppose the adoption by the filing of "an affidavit of mailing" with the court on January 7, 1992. Under the new adoption statute (Children's Code, Articles 1120-1143, which became effective on January 1, 1992) the burden of proceeding quickly to a best interest hearing is imposed on the court as well as the litigants. However, here the trial court denied the parent's request for time to present evidence on the grounds he was mandated to conduct the "best interest hearing" within twenty days of the date of the filing of the petition opposing the adoption (March 20, 1992). The denial resulted in the "best interest" of the child being decided solely on the basis of the evidence submitted by the prospective adoptive parents. The record is barren of facts to show the reasons for the delay between the time the notice of the desire to revoke the surrender was mailed and the "best interest hearing" was held.
In In Re J.M.P., there was no evidence as to psychological bonding. Here, there is only evidence submitted by the prospective adoptive parents. Therefore, I see no difference in principle between the situation involved in In Re J.M.P. and that involved here. In my view, although there was no fraud or duress involved in the execution of the surrender and the requirements of the statute as to the procedure for execution of the Act of Surrender were adhered to, fairness and justice require giving the natural parents an opportunity to present evidence as to psychological bonding of the child with either set of parents, regardless of the reason for the delay in the conduct of the "best interest hearing".
For the reasons stated, therefore, I would set aside the trial court's ruling and remand the case for an evidentiary hearing, in which both sets of parents would be permitted to offer additional evidence on the question of psychological bonding of the child with the natural parents and/or the prospective adoptive parents, including expert evidence in rebuttal of the expert evidence presently in the record.